No. 16-35010

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

*_____*

**CHERYL KATER**,
*Plaintiff-Appellant,*

**v.**

**CHURCHILL DOWNS, INC.**,
*Defendant-Appellee.*

*_____*

On Appeal from the United States District Court
For the Western District of Washington
Case No. 2:15-cv-00612-MJP
The Honorable Marsha J. Pechman

---

## PLAINTIFF-APPELLANT'S OPENING BRIEF

---

Ryan D. Andrews
randrews@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
Alexander G. Tievsky
atievsky@edelson.com

EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................... i

TABLE OF AUTHORITIES ................................................. iii

JURISDICTIONAL STATEMENT ....................................... 1

ISSUE PRESENTED FOR REVIEW ...................................... 2

PERTINENT STATUTORY PROVISIONS ........................... 2

STATEMENT OF THE CASE ................................................ 3

   I.    Churchill Downs's Big Fish Casino ................................. 3

   II.   Washington's Gambling Loss Recovery Statute ......................... 7

   III.  Ms. Kater's Experience and the Proceedings Below ................. 10

SUMMARY OF THE ARGUMENT ...................................... 11

STANDARD OF REVIEW .................................................... 11

ARGUMENT ......................................................................... 12

   I.    Big Fish Casino Is an Illegal Gambling Game ........................... 13

      A.    Big Fish Casino Chips Are Things of Value ........................ 15

         1.    Big Fish Casino Chips Are Credits that Entitle Players to Entertainment ........................... 16

         2.    Casino Chips Have a Direct Relationship to Real Money ................................................. 21

      B.    Big Fish Casino Players Wager Chips at a Game of Chance ................................................... 22

II.    Ms. Kater Lost Money Playing at the Big Fish Casino ............. 24

CONCLUSION ........................................................................... 26

STATEMENT OF RELATED CASES ..................................................... 27

CERTIFICATE OF COMPLIANCE ...................................................... 28

CERTIFICATE OF SERVICE ............................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Budget Rent A Car Corp. v. Dep't of Licensing,*
   31 P.3d 1174 (Wash. 2001) ............................................................. 20

*Bullseye Distrib. LLC v. State Gambling Comm'n,*
   110 P.3d 1162 (Wash. Ct. App. 2005) ................................. 18, 19, 20

*Cerillo v. Esparza,*
   142 P.3d 155 (Wash. 2006) ............................................................. 20

*Detrich v. Ryan,*
   740 F.3d 1237 (9th Cir. 2013) ........................................................ 10

*Heitfeld v. Benevolent & Protective Order of Keglers,*
   220 P.2d 655 (Wash. 1950) .......................................................... 7, 25

*Humphrey v. Viacom, Inc.,* No. 06 2768 DMC,
   2007 WL 1797648 (D.N.J. June 20, 2007) .................................... 25

*Jongeward v. BNSF R. Co.,*
   278 P.3d 157 (Wash. 2012) ............................................................. 18

*Mason v. Mach. Zone, Inc.,* No. CV JKB-15-1107,
   2015 WL 6335771 (D. Md. Oct. 20, 2015) .................................... 17

*Nucleonics All., Local Union No. 1-369 v. Wash. Pub. Power Supply Sys.,* 677 P.2d 108 (Wash. 1984) ....................................... 12

*O'Neil v. Crampton,*
   140 P.2d 308 (Wash. 1943) ............................................................... 7

*Petrie v. Elec. Game Card, Inc.,*
   761 F.3d 959 (9th Cir. 2014) .................................................... 11, 12

*Phillips v. Double Down Interactive LLC*, No. 15 C 04301,
2016 WL 1169522 (N.D. Ill. Mar. 25, 2016) .................................. 25

*Rivard v. State*,
231 P.3d 186 (Wash. 2010)........................................................... 17

*Rosenbloom v. Pyott*,
765 F.3d 1137 (9th Cir. 2014) ..................................................... 11

*Rousso v. State*,
239 P.3d 1084 (Wash. 2010)..................................................... 7, 13

*Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*,
810 F.3d 509 (7th Cir. 2016) ....................................................... 25

*Soto v. Sky Union, LLC*, No. 15 C 4768,
2016 WL 362379 (N.D. Ill. Jan. 29, 2016) ................................... 17

*State v. Bahl*,
193 P.3d 678 (Wash. 2008).......................................................... 16

*State ex rel. Hagan v. Chinook Hotel, Inc.*,
399 P.2d 8 (Wash. 1965).............................................................. 18

*State v. Hardtke*,
352 P.3d 771 (Wash. 2015)........................................................... 15

*Thornell v. Seattle Serv. Bureau, Inc.*,
363 P.3d 587 (Wash. 2015)............................................................. 9

## Statutory Provisions

28 U.S.C. § 1291 ............................................................................ 1

28 U.S.C. § 1332(d)(2)..................................................................... 1

1987 Wash. Sess. Laws 14-15 ...................................................... 14

2005 Wash. Sess. Laws 1605 ..................................................... 9

RCW 4.24.070 ....................................................................*passim*

RCW 9.46.010 ................................................................... 8, 12

RCW 9.46.0237 ...................................................... 11, 13, 14, 22

RCW 9.46.0285 ..................................................................*passim*

RCW 9.46.072 ........................................................................ 8

RCW 19.86.010 .................................................................... 10

RCW 43.20A.890 ................................................................... 8

RCW 43.20A.892 ................................................................... 8

RCW 82.04.285 ..................................................................... 8

**Other Authorities**

William C. Carstanjen, *CEO Message*, Churchill Downs, Inc.,
http://goo.gl/5lGTjz ............................................................ 3

Churchill Downs, Inc., *2014 Annual Report*,
http://1.usa.gov/21P06cs................................................... 10

*Credit, n.*, *Oxford English Dictionary Online* (3d ed., March 2013) ...... 16

Evergreen Council on Problem Gambling, *What's the Big Deal
About Teen Gambling?*, http://goo.gl/2F5MTR ................................ 9

Natasha Dow Schüll, *Addiction by Design: Machine Gambling in
Las Vegas* (2014)................................................................... 6

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (a) at least one member of the putative class is a citizen of a state different from defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under the subsection apply to this action.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because Ms. Kater appeals the district court's dismissal of her case with prejudice, a final judgment that disposed of all parties' claims. That judgment was entered on November 19, 2015. (EOR 3.) Ms. Kater filed a motion for reconsideration, which was denied on December 7, 2015. (EOR 6.) She then timely filed her Notice of Appeal on January 5, 2016. (EOR 1.)

## ISSUE PRESENTED FOR REVIEW

Whether the plaintiff stated a claim under Washington's gambling loss recovery statute, RCW 4.24.070, when she sought to recover money she lost playing computerized casino games in defendant's online casino.

## PERTINENT STATUTORY PROVISIONS

Statutory provisions pertinent to this appeal are set forth in the Addendum to this brief.

## STATEMENT OF THE CASE

Plaintiff-Appellant Cheryl Kater brought this action against Defendant-Appellee Churchill Downs, Inc., a multi-state gambling operation best known for hosting the Kentucky Derby at its namesake racetrack. Ms. Kater seeks to recover monetary losses she incurred as a result of gambling in Churchill Downs's Big Fish Casino, an unlicensed, unlawful online casino that consumers can access through a smartphone app. At the Big Fish Casino, players exchange real money for casino chips that they wager on games of chance like slot machines, roulette, and video blackjack. Ms. Kater lost over a thousand dollars at the Big Fish Casino, and, consistent with the Washington Legislature's goal of making illegal gambling operations unprofitable, she sought to exercise her statutory right to recoup the money she lost. The district court, however, dismissed the case, holding that the Big Fish Casino does not offer illegal gambling because its casino chips are not "thing[s] of value" under Washington law.

## I.     Churchill Downs's Big Fish Casino.

Churchill Downs has spent the last several years expanding its business from operating racetracks to managing a nationwide,

integrated gambling conglomerate. William C. Carstanjen, *CEO Message*, Churchill Downs, Inc., http://goo.gl/5lGTjz. It now "own[s] and operate[s] six successful casinos, the United States' premier online betting platform, communications and data-services companies that support[s] [their] wagering operations, and five racetracks[.]" *Id.*

As part of its expansion into online gambling, Churchill Downs also runs the Seattle-based Big Fish Casino, a popular online casino on smartphones and tablets. (EOR 16 ¶ 1; EOR 22 ¶ 24.) Big Fish is big business for Churchill Downs: It spent $885 million dollars to acquire the company, and since then, the app has generated hundreds of millions of dollars in revenue. (EOR 22-23 ¶¶ 22, 24-25.)

The Big Fish Casino makes money by offering electronic versions of popular casino games, such as slot machines, roulette, and video blackjack. (EOR 17 ¶¶ 2-3.) Like its brick-and-mortar casinos, Churchill Downs's online casino operates by enticing players to open their wallets to get casino chips, which are required to play the games at the Big Fish Casino. (EOR 23-24 ¶¶ 27-28.) Churchill Downs offers various packages of chips, ranging from $1.99 for 20,000 chips to $249 for 10 million chips. (*Id.*) In addition to selling chips itself, Churchill Downs also

facilitates a secondary market that enables players to transfer chips to other players (often for money) as long as they pay a transaction fee to Churchill Downs. (EOR 27-28 ¶¶ 35-36.)

Using their chips, players wager at games like a one-armed bandit style slot machine, complete with a virtual handle that players pull to set the reels in motion. (EOR 24-25 ¶¶ 30-32.) Players at these machines choose how many chips they want to bet each time they pull the lever, which determines the size of the jackpot they stand to win. (EOR 25-26 ¶¶ 32-33.) For example, a player betting $1 worth of chips might have a "HUGE WIN" and gain ten times that amount. (EOR 25-26 ¶¶ 33-34.) More often, though, players lose all of their chips and must ante up with more real money if they wish to continue playing. (EOR 23 ¶ 27.)

Each time players run out of chips, Churchill Downs replaces the game with a full-screen message that reads "Insufficient Cash," directly above a brightly colored button labeled "Get Chips." (EOR 23 ¶ 27.) Players who click the "Get Chips" button are immediately directed to Churchill Downs's cashier's cage, where they must exchange more real

money for chips in order to continuing placing bets. (EOR 23-24 ¶¶ 27-28.)

The gambling app industry refers to games like the ones offered at the Big Fish Casino as "free-to-play," (*see* EOR 18 ¶ 12), but that phrase is a misnomer. While Churchill Downs provides players with a small allotment of promotional chips in an effort to entice them to play the game, the casino games do cost money. (EOR 23-24 ¶ 28.) And for the relatively small number of gambling addicts who produce a huge share of the Big Fish Casino's revenue, (*see* EOR 20 ¶ 16), it can end up costing even more than that. People who gamble at machines play "not to *win* but simply to *continue*." Natasha Dow Schüll, *Addiction by Design: Machine Gambling in Las Vegas* 2, 12 (2014) (emphasis in original). "[I]t is not the chance of winning to which [machine gamblers] become addicted; rather, what addicts them is the world-dissolving state of subjective suspension and affective calm they derive from machine play." *Id.* at 19. All the while, they keep feeding money into the machine, destroying families and causing financial ruin. *See generally id.* at 189-234.

## II.    Washington's Gambling Loss Recovery Statute.

Because of these and other concerns, gambling is highly regulated in Washington. Historically, common law provided no recourse for people who lost money gambling. *Heitfeld v. Benevolent & Protective Order of Keglers*, 220 P.2d 655, 659 (Wash. 1950). However, the Washington Legislature modified the traditional rule "based upon the idea that, if gambling is to be discouraged, one way in which it might be done would be to permit recovery by the loser and at the same time protect those inclined to gamble against their weakness and improvidence[.]" *O'Neil v. Crampton*, 140 P.2d 308, 310 (Wash. 1943). As such, Washington law provides that:

> All persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost.

RCW 4.24.070.

Washington has legalized some limited forms of gambling, which is why the statute only provides for recovery of losses from *illegal* gambling games, such as those operated on the Internet. *See Rousso v. State*, 239 P.3d 1084, 1086 (Wash. 2010) (noting that all Internet

gambling is illegal in Washington). Legal gambling in Washington is limited in scope and operates "by strict regulation and control." RCW 9.46.010. Running casino games for profit requires a license, and it cannot be the primary business of the operator. *See* RCW 9.46.070. Licensees must pay a percentage of their gambling income into Washington's problem gambling account, RCW 82.04.285(2), which funds "the prevention and treatment of problem and pathological gambling," RCW 43.20A.890(1); 43.20A.892. They must also display the following warning, verbatim, on their premises and in all of their advertising:

> CAUTION: Participation in gambling activity may result in pathological gambling behavior causing emotional and financial harm. For help, call 1-800-547-6133.

RCW 9.46.072.

These regulations—and the loss recovery statute—are broad measures designed to protect the public at large from the conduct of Washington companies engaged in a line of business that can easily become unscrupulous and socially undesirable if not closely monitored and regulated. *See* RCW 9.46.010. The legislature directed that the anti-gambling regime be "liberally construed" to, among other goals,

"promote the social welfare of the people" and "restrain all persons from seeking profit from professional gambling activities in this state[.]" *Id.*; *cf. Thornell v. Seattle Serv. Bureau, Inc.*, 363 P.3d 587, 592 (Wash. 2015) (recognizing that liberally construed consumer protection statutes should apply to "acts that directly or indirectly affect the people of Washington," notwithstanding the plaintiff's residence).

Specifically, the legislature has recognized that unregulated for-profit gambling contributes to the devastating problem of gambling addiction, which affects thousands of adults and adolescents across Washington and the United States. *See* 2005 Wash. Sess. Laws 1605. Internet gambling is especially pernicious in this regard because it makes gambling uniquely accessible to teenagers. Evergreen Council on Problem Gambling, *What's the Big Deal About Teen Gambling?*, http://goo.gl/2F5MTR (warning parents that "[o]ne-third of Washington teens surveyed said they had gambled in the last 12 months" and thousands of Washington high school seniors "are already having problems because of gambling"). Indeed, Churchill Downs alerted investors in its 2014 Annual Report that increased regulatory scrutiny

of its marketing to children could prove a drain on its earnings. *See*

Churchill Downs, Inc., *2014 Annual Report* 36, http://1.usa.gov/21P06cs.

## III.   Ms. Kater's Experience and the Proceedings Below.

Between January 2013 and March 2015, Ms. Kater lost over

$1,000 wagering on various slot machines and other games of chance in

the Big Fish Casino.[1] (EOR 28 ¶¶ 37-38.) Ms. Kater filed this case

against Churchill Downs seeking to recover, among other things, her

losses under Washington's gambling loss recovery statute. (EOR 31-33.)

The district court dismissed her claims with prejudice, holding that

betting in the Big Fish Casino was not "gambling" because chips are not

"things of value" under Washington law. (EOR 12-13, 15.) Ms. Kater

now appeals. (EOR 1.)[2]

---

[1]     Although the complaint merely notes that Ms. Kater lost more than $1,000, her actual losses are more than ten times that amount.

[2]     In addition to her claim under the loss recovery statute, Ms. Kater sought relief under the Washington Consumer Protection Act, RCW 19.86.010 *et seq.*, and common law unjust enrichment. (*See* EOR 33-37.) The parties agreed below that Ms. Kater's Consumer Protection Act and common law claims "are contingent on Big Fish Casino constituting illegal gambling in violation of Washington law," and the district court did not consider them in any detail. (EOR 14-15.) It is therefore unnecessary to address any issues specific to those claims here, since they are most properly considered by the district court in the first instance after remand. *Detrich v. Ryan*, 740 F.3d 1237, 1248 (9th Cir. 2013) (en banc) (plurality opinion) ("A standard practice … is to remand

## SUMMARY OF THE ARGUMENT

The Big Fish Casino offers "gambling" under Washington law because, contrary to the district court's understanding, Big Fish Casino chips are indeed "things of value." The chips satisfy the statutory definition of "thing of value" for two reasons: First, they are "credit[s] … involving extension of … entertainment or a privilege of playing at a game or scheme without charge." RCW 9.46.0285. Second, Churchill Downs's chip transfer system shows that chips are "exchangeable for money" and "contemplat[e] transfer of money." *Id.* Consequently, allowing players to wager chips on games of chance is illegal "gambling," RCW 9.46.0237, and Ms. Kater is entitled to recover the money she lost at those games from Churchill Downs under Washington's loss recovery statute, RCW 4.24.070.

## STANDARD OF REVIEW

The grant of a motion to dismiss under Rule 12(b)(6) is reviewed de novo. *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 966 (9th Cir.

---

to the district court for a decision in the first instance without requiring any special justification for so doing."); *Rosenbloom v. Pyott*, 765 F.3d 1137, 1159 n.18 (9th Cir. 2014) (following this Court's "usual practice" and "declin[ing] to reach … issues in the first instance" where "the district court did not reach those arguments").

2014). On appeal, the Court assumes all facts alleged in the complaint to be true and construes them in the light most favorable to the plaintiff. *Id.* "Review is limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Id.*

## ARGUMENT

To recover gambling losses, a plaintiff must prove that she (1) played an illegal gambling game and (2) lost money or something of value doing so. RCW 4.24.070. It is the stated policy of the Washington Legislature to "limit[] the nature and scope of gambling activities," especially where the person running the gambling operation is doing so to make a profit. *See* RCW 9.46.010. Washington's anti-gambling laws must "be liberally construed to achieve such end." *Id.* This type of legislative declaration is a binding "command that the coverage of [the] act's provisions be liberally construed and that its exceptions be narrowly confined." *Nucleonics All., Local Union No. 1-369 v. Wash. Pub. Power Supply Sys.*, 677 P.2d 108, 110 (Wash. 1984).

In dismissing Ms. Kater's case, the district court ignored the legislature's command to construe Washington's anti-gambling laws

liberally. Instead, it read the law narrowly and came to the erroneous conclusion that the Big Fish Casino—despite being an online casino run by a gambling company for profit—is not an illegal gambling game. To the contrary, the Big Fish Casino *does* meet the statutory definition of "gambling" because it involves wagering something of value—the casino chips that Big Fish players feed into the slot machines—for the chance to win more. Since Ms. Kater lost money playing the Big Fish Casino, she is entitled to recover her losses from Churchill Downs.

## I.  Big Fish Casino Is an Illegal Gambling Game.

Plaintiffs can recover gambling losses where the loss occurred at an "illegal gambling game." RCW 4.24.070. Per the 1973 Gambling Act, gambling means:

> staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome.

RCW 9.46.0237.[3] Although some forms of gambling are legal in Washington, all online gambling is illegal. *Rousso*, 239 P.3d at 1086.

---

[3]     Although RCW 9.46.0237 and other definitions from the 1973 Gambling Act denote the definitions of terms "as used in this chapter," those words were only added when the definitions section of the Act was

Any activity that meets the definition in RCW 9.46.0237 and takes place online is therefore illegal gambling.

The Court's "fundamental objective" in statutory interpretation "is to determine and give effect to the intent of the legislature." *State v. Sweany*, 281 P.3d 305, 308 (Wash. 2012). To that end, "review always begins with the plain language of the statute." *Rest. Dev., Inc. v. Cananwill, Inc.*, 80 P.3d 598, 601 (Wash. 2003). The plain language of the Gambling Act, understood in the context of casino games, compels the conclusion that the Big Fish Casino offers illegal online gambling because (1) the chips players use to place wagers are things of value and (2) players "stak[e]" or "risk[]" those chips "upon the outcome of a contest of chance … upon an agreement that the [player] … will receive" more chips "in the event of a certain outcome." *See* RCW 9.46.0237. Contrary to the district court's holding, Washington law does not

---

split into shorter sections to "improve the readability and facilitate the future amendment of these sections." 1987 Wash. Sess. Laws 14-15 (codified as RCW 9.46.901). The legislature directed that the recodification "shall not change the meaning of any of the provisions involved." *Id.* at 15. The legislature's original intent therefore remains unchanged: to apply the definitions in the Act to all gambling-related statutes.

require that a game award a money or merchandise prize to be considered gambling.

## A.  Big Fish Casino Chips Are Things of Value.

RCW 9.46.0285 defines "thing of value" to include three categories:

> [1] any money or property, [2] any token, object or article exchangeable for money or property, or [3] any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge.

Since the statute is written in the disjunctive, an item need only fall into one of these categories to meet the definition. *See State v. Hardtke*, 352 P.3d 771, 775 (Wash. 2015) (finding the legislature's use of the word "or" to create "separate and distinct categories").

The Big Fish Casino's chips satisfy this definition for two separate reasons. First, they are a "form of credit or promise … involving extension of … entertainment or a privilege of playing at a game … without charge" because, once acquired, they represent the holder's entitlement to play games at the Big Fish Casino without payment of any additional money. Second, the nature of the Big Fish Casino chip transfer system shows that chips are "token[s] … exchangeable for

money" and "a form of credit … directly or indirectly … contemplating transfer of money," because it enables players to sell chips to each other, with Churchill Downs taking a cut. Either way, Churchill Downs's casino chips are "thing[s] of value" under Washington law.

### 1. Big Fish Casino Chips Are Credits that Entitle Players to Entertainment.

Big Fish Casino chips are a "form of credit … involving extension of … entertainment" and of "a privilege of playing at a game … without charge." *See* RCW 9.46.0285. In the context of a casino game, a credit is "a unit used as a measure of a person's entitlement to use of a particular … service." *Credit, n.*, *Oxford English Dictionary Online* (3d ed., March 2013); *see State v. Bahl*, 193 P.3d 678, 686 (Wash. 2008) (finding it acceptable to use a dictionary to discern plain meaning of undefined statutory term). Chips are credits that measure the amount of gameplay—or entertainment—Churchill Downs has extended to each player in exchange for real money. A player who puts down a dollar at the Big Fish Casino has the opportunity to rack up more than a dollar's worth of credits without giving Churchill Downs any more money. Chips thus involve extension both of entertainment and of free

gameplay that would otherwise cost money, and they fall neatly into the "thing of value" definition.

The district court, however, rejected this plain language interpretation and held that casino chips are not things of value because they are not a "real cash or merchandise" prize. (EOR 13.) But if an item had to be "real cash" (money) or "merchandise" (property) to be a thing of value, then only the first part of the "thing of value" definition—"any money or property"—would have meaning. *See* RCW 9.46.0285. The other two parts of the definition would be rendered superfluous, which cannot be the case. *See, e.g.*, *Rivard v. State*, 231 P.3d 186, 190 (Wash. 2010) (holding that courts must "interpret a statute to give effect to all language, so as to render no portion meaningless or superfluous"). And although some courts have found that such a limitation exists in other states that lack a definition for "thing of value,"[4] there are no grounds to read it into Washington law,

---

[4]     *See, e.g.*, *Soto v. Sky Union, LLC*, No. 15 C 4768, 2016 WL 362379, at *8 (N.D. Ill. Jan. 29, 2016) (citing Illinois law holding that "the possibility of winning a greater or lesser amount of amusement is not gambling" where legislature did not define "thing of value"); *Mason v. Mach. Zone, Inc.*, No. CV JKB-15-1107, 2015 WL 6335771, at *9 (D. Md. Oct. 20, 2015), *appeal docketed* (4th Cir. Nov. 23, 2015) (holding that

especially considering the liberal-construction requirement. *See Jongeward v. BNSF R. Co.*, 278 P.3d 157, 160 n.5 (Wash. 2012) (noting that where others states have "markedly different statutes" and "markedly different philosophies," Washington's approach "*should be different*") (emphasis in original); *State ex rel. Hagan v. Chinook Hotel, Inc.*, 399 P.2d 8, 13 (Wash. 1965) (refusing to change definition of term defined by the legislature). The district court's insistence on a "real cash or merchandise" prize is therefore misplaced.

Consistent with the plain language of the statute, the only published Washington case to address the "thing of value" definition concluded that credits representing gameplay are things of value, whether or not they have independent pecuniary value. *Bullseye Distrib. LLC v. State Gambling Comm'n*, 110 P.3d 1162 (Wash. Ct. App. 2005). *Bullseye* involved a vending machine at which players used "play points" to play a game "designed to emulate a casino's eight-line video slot machine." *Id.* at 1163. Players could get the play points either by putting money into the machine or by using a "promotional play voucher," which was free, but limited to one per person per day. *Id.*

Maryland law does not permit recovery of virtual currency because it uses the phrase "loses money").

Players could also get play points by winning the game of chance, allowing them to continue playing without paying more money. *Id.* at 1164.

In determining that the machine at issue in *Bullseye* offered gambling, the court considered whether play points were "thing[s] of value" under RCW 9.46.0285. The court determined that "[a]lthough they may lack pecuniary value on their own, these points fall within the definition of 'thing of value' because they extend the privilege of playing the game without charge." *Bullseye*, 110 P.3d at 1166. That's what's going on here: even if Big Fish Casino chips do not have any inherent pecuniary value (though they may be sold on the secondary market), they nevertheless extend players the privilege of playing the game, which would otherwise cost money. That makes them things of value.

The district court, however, incorrectly reasoned that the Big Fish Casino differs from the game in *Bullseye* because it is "available to play for free." (EOR 13.) But despite industry use of the term "free to play," the Big Fish Casino *is not free*. In fact, it works much the same way as the *Bullseye* machine, which gave players one free play every day, then required them to pay if they wanted to play more. 110 P.3d at 1163,

1166-67. At the Big Fish Casino, it takes chips to play the games, and with the exception of a small number of promotional chips provided by Churchill Downs as an enticement to start playing, players have to cough up cash to get chips. Indeed, the revenue stream from chips, provided in large part by players who are addicted to gambling, is how the Big Fish Casino has made hundreds of millions of dollars for Churchill Downs.

At bottom, Big Fish Casino chips are things of value because they extend both entertainment and the privilege of playing a non-free game without charge. It is irrelevant that the house sometimes tosses a handful of complementary chips in a player's direction. *See Bullseye*, 110 P.3d at 1167.[5]

---

[5] The district court correctly rejected Churchill Downs's attempt to insert a pamphlet and slide deck purportedly produced by the Washington State Gambling Commission into the record to prove that the Big Fish Casino does not offer gambling. (EOR 12.) It is improper to defer to an agency's informal interpretation of a statute where the plain language of the statute is unambiguous, *Cerillo v. Esparza*, 142 P.3d 155, 158-59 (Wash. 2006), and administrative agencies receive no deference where "the agency's interpretation conflicts with the relevant statute." *Budget Rent A Car Corp. v. Dep't of Licensing*, 31 P.3d 1174, 1180 (Wash. 2001). As explained above, limiting "thing of value" to only money and property renders much of the definition superfluous and conflicts with the unambiguous statutory language.

### 2. Casino Chips Have a Direct Relationship to Real Money.

Although the fact that casino chips are a form of credit involving extension of entertainment and additional gameplay suffices on its own to meet the "thing of value" definition, the chips also meet the definition because they are "token[s] … exchangeable for money" and "credit[s] … contemplating the transfer of money." *See* RCW 9.46.0285. That's because Churchill Downs built a backdoor way for players to cash out by allowing them to move chips between accounts. (EOR 27-28 ¶¶ 35-36.) This system gave rise to a secondary market where players use online auction websites to sell their chips to other players for money. (*Id.*) Transferring chips isn't free though: Churchill Downs pockets a portion of the chips transferred by charging a transaction fee. (*Id.*)

In support of its 12(b)(6) motion, Churchill Downs insisted that the court should ignore this secondary market because the fine-print terms of its user agreement specify that "[v]irtual items may not be purchased or sold." (Dkt. 35 at 6.) The district court agreed, holding that "[a]llowing Plaintiff and those similarly situated to sue Defendant for damages based on their own breach of contract would be contrary to basic principles of law and equity." (EOR 14.)

But Ms. Kater is not seeking damages relating to any sales of chips in violation of Churchill Downs's user agreement. The secondary market is relevant simply because its existence demonstrates that players can exchange their chips for money. Despite the user agreement's prohibition on selling chips for profit, Ms. Kater alleges that Churchill Downs knowingly facilitates such violations, and, in fact, profits off of them. That fact makes it plausible that casino chips are "exchangeable for money," "contemplat[e] transfer of money," or both. *See* RCW 9.46.0285. Accordingly, the existence of the secondary market provides a second, independent reason that casino chips are things of value under Washington law.

## B. Big Fish Casino Players Wager Chips at a Game of Chance.

Because casino chips are things of value, any game that involves "staking" or "risking" chips "upon the outcome of a contest of chance" is a gambling game, as long as there is "an agreement or understanding that the [player] … will receive something of value [i.e., more chips] in the event of a certain outcome." RCW 9.46.0237. There can be no serious dispute that under the allegations in Ms. Kater's complaint, the Big Fish Casino meets this element: It is a game of chance that allows

players to risk their chips on the understanding that Churchill Downs will give players more chips if they win.

To start, the casino games in the Big Fish Casino are games of chance. The outcome of the slots, blackjack, and roulette tables depend solely on the operation of Churchill Downs's algorithms, and it is entirely out of the control of the player, similar to a slot machine in one of Churchill Down's licensed casinos (except that Churchill Downs has the unfettered ability to set and change the odds instead of being limited by a state regulator). (EOR 25 ¶ 32.) There is no skill involved.

The games of chance at the Big Fish Casino require players to "stake" or "risk" their chips—that is, to take a chance of losing the chips in exchange for the potential of gaining more. In order to play a slot machine at the Big Fish Casino, for example, players decide how many casino chips they're going to bet. To that end, Churchill Downs offers the same options found on slots in physical casinos, such as "BET/LINE," which allows the player to control exactly how many chips she wants to wager, and "BET MAX," which automatically sets the maximum bet for that game. (EOR 24-25 ¶¶ 30-31.) Since the player is

required to put up chips in order to play the game of chance, she has "staked" those chips on the game.

Finally, the games of chance are based on the understanding that players can win substantially more chips than they bet. At the slot machines, for example, if the virtual reels line up unfavorably to the player, then Churchill Downs keeps the chips; if they line up favorably, the player can win substantially more chips than she bet. By operation of chance alone, a bet of 10,000 chips (about $1 in real money) might lead to a "HUGE WIN" of 100,000 chips, which are worth about $10 in real money. (EOR 25-26 ¶ 33.) Because, as explained above, chips are things of value, the understanding that players are risking chips for the chance of winning more chips makes the Big Fish Casino an illegal online gambling game.

## II. Ms. Kater Lost Money Playing at the Big Fish Casino.

Last, because the Big Fish Casino is an illegal gambling game, Ms. Kater is entitled to recover the money that she lost playing it. RCW 4.24.070. Washington law permits plaintiffs to recover their gambling losses from "the dealer or player winning, or from the proprietor for whose benefit [an illegal gambling game] was played or dealt[.]" *Id.*

That's a much broader definition than many other states, which only allow recovery from a "winner." *Compare Heitfeld*, 220 P.2d at 660 (noting that "[w]hile most states permit a recovery against the winner alone," Washington "allows recovery against the proprietor as well") *with Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*, 810 F.3d 509, 510-11 (7th Cir. 2016) (noting that Illinois law permits recovery from only the "winner" of a gambling game); *Phillips v. Double Down Interactive LLC*, No. 15 C 04301, 2016 WL 1169522, at *5 (N.D. Ill. Mar. 25, 2016) (same); *Humphrey v. Viacom, Inc.*, No. 06 2768 DMC, 2007 WL 1797648, at *10 (D.N.J. June 20, 2007) (noting that New Jersey, District of Columbia, Massachusetts, South Carolina, and Kentucky law all allow recovery only from a "winner" at a gambling game).

Here Ms. Kater gave Churchill Downs a significant amount of money for casino chips, and then she entered into wagers with Churchill Downs for the chance of winning more chips. As at Churchill Downs's brick-and-mortar casinos and racetracks, the house at the Big Fish Casino has an edge, and Ms. Kater did not come out ahead. Because Churchill Downs is both the winner of Ms. Kater's gambling losses (since it is on the other side of the wager) and the proprietor of

the Big Fish Casino, Ms. Kater can recover those losses from Churchill Downs.

## CONCLUSION

Ms. Kater lost money at Churchill Downs's illegal online gambling operation, and she is entitled to recover that money under Washington law. The judgment of the district court should be vacated and the case remanded for further proceedings.

Dated: May 13, 2016

Respectfully submitted,

**CHERYL KATER,**

By: s/ Alexander G. Tievsky
*One of Plaintiff-Appellant's Attorneys*

Ryan D. Andrews
randrews@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
Alexander G. Tievsky
atievsky@edelson.com

EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff-Appellant*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff-Appellant states that no other cases currently pending in this Court are related to this case.

Dated May 13, 2016                    s/ Alexander G. Tievsky
                                      *One of Plaintiff-Appellant's Attorneys*

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,082 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word for Mac 2011 in 14 point Century Schoolbook font.

Dated May 13, 2016            s/ Alexander G. Tievsky
                                *One of Plaintiff-Appellant's Attorneys*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 13, 2016. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Alexander G. Tievsky

No. 16-35010

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**CHERYL KATER**,
*Plaintiff-Appellant,*

**v.**

**CHURCHILL DOWNS, INC.**,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
For the Western District of Washington
Case No. 2:15-cv-00612-MJP
The Honorable Marsha J. Pechman

---

## ADDENDUM TO PLAINTIFF-APPELLANT'S OPENING BRIEF

---

Ryan D. Andrews
randrews@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
Alexander G. Tievsky
atievsky@edelson.com

EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

*Counsel for Plaintiff-Appellant*

# ADDENDUM

## RCW 4.24.070 – Recovery of Money Lost at Gambling

All persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost.

## RCW 9.46 – Gambling – 1973 Act
## (relevant sections)

### RCW 9.46.010
### Legislative Declaration

The public policy of the state of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control.

It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace.

The legislature further declares that the raising of funds for the promotion of bona fide charitable or nonprofit organizations is in the public interest as is participation in such activities and social pastimes as are hereinafter in this chapter authorized.

The legislature further declares that the conducting of bingo, raffles, and amusement games and the operation of punchboards, pull-tabs, card games and other social pastimes, when conducted pursuant to the provisions of this chapter and any rules and regulations adopted pursuant thereto, are hereby authorized, as are only such lotteries for which no valuable consideration has been paid or agreed to be paid as hereinafter in this chapter provided.

The legislature further declares that fishing derbies shall not constitute any form of gambling and shall not be considered as a lottery, a raffle, or an amusement game and shall not be subject to the provisions of this chapter or any rules and regulations adopted hereunder.

The legislature further declares that raffles authorized by the fish and wildlife commission involving hunting big game animals or wild turkeys shall not be subject to the provisions of this chapter or any rules and regulations adopted hereunder, with the exception of this section and RCW 9.46.400.

All factors incident to the activities authorized in this chapter shall be closely controlled, and the provisions of this chapter shall be liberally construed to achieve such end.

## RCW 9.46.0237
## "Gambling"

"Gambling," as used in this chapter, means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome. Gambling does not include fishing derbies as defined by this chapter, parimutuel betting and handicapping contests as authorized by chapter 67.16 RCW, bona fide business transactions valid under the law of contracts, including, but not limited to, contracts for the purchase or sale at a future date of securities or commodities, and agreements to compensate for loss caused by the happening of chance, including, but not limited to, contracts of indemnity or guarantee and life, health, or accident

insurance. In addition, a contest of chance which is specifically excluded from the definition of lottery under this chapter shall not constitute gambling.

**9.46.0285**
**"Thing of Value"**

"Thing of value," as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 13, 2016. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Alexander G. Tievsky